## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JAMES THIESSEN**, as Personal Representative of the Estate of JERRY RAY GARCIA, deceased, **TERESA M. GARCIA**, individually, and **CHRISTINA GARCIA**, individually, Plaintiffs, v. **CITY OF ELK CITY, OKLAHOMA**, a municipal corporation; **JOSH VANDEBURGH**, individually and in his official capacity as Sergeant, Elk City Police Department; **LOGAN NELSON**, individually and in his official capacity as Patrol Officer, Elk City Police Department; **EDDIE HOLLAND**, individually and in his official capacity as Chief of Police, Elk City Police Department; **JOHN DOES 1–10**, individually and in their official capacities, Defendants. | Case No. _____ **CIVIL RIGHTS COMPLAINT JURY TRIAL DEMANDED** |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER
## 42 U.S.C. § 1983, WRONGFUL DEATH, AND STATE LAW CLAIMS

COME NOW Plaintiffs James Thiessen, as Personal Representative of the Estate of Jerry

Ray Garcia, deceased, Teresa M. Garcia, individually, and Christina Garcia, individually

(collectively "Plaintiffs"), and for their Complaint against Defendants City of Elk City,

Oklahoma, Josh VanDeburgh, Logan Nelson, Eddie Holland, and John Does 1–10 (collectively "Defendants"), state and allege as follows:

## INTRODUCTION

1. This is an action for compensatory and punitive damages and equitable relief arising from the fatal shooting of Jerry Ray Garcia ("Mr. Garcia"), a twenty-nine-year-old man, by Elk City Police Department officers on August 2, 2024. Mr. Garcia was shot at least fourteen (14) times, sustaining a minimum of twenty-one (21) gunshot wounds to his head, neck, torso, and extremities. He died at the scene. The Oklahoma Office of the Chief Medical Examiner classified the manner of death as **homicide**.

2. The Defendant Officers' use of deadly force was objectively unreasonable and unconstitutional. After maintaining lethal cover on Mr. Garcia for over a minute with their weapons already drawn, Officer Logan Nelson explicitly ordered Mr. Garcia to "take that knife out of your pocket." When Mr. Garcia reached for the knife in apparent compliance with this direct command, the officers began screaming contradictory orders and opened fire, shooting him at least fourteen (14) times from a distance of approximately 15 to 20 feet while he was walking — not running or charging — toward them. At no point did Mr. Garcia charge, sprint, lunge at, or make any slashing or stabbing motion toward the officers. From Officer Nelson's arrival on scene to the final gunshot, the entire encounter lasted approximately two minutes.

3. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Mr. Garcia's constitutional rights under the Fourth and Fourteenth Amendments to the United

States Constitution, as well as under Oklahoma state law for wrongful death pursuant to 12 O.S. § 1053 and the Oklahoma Survival Statute.

## PARTIES

4. **Plaintiff James Thiessen** is the duly appointed Personal Representative of the Estate of Jerry Ray Garcia, deceased, appointed by the District Court of Beckham County, Oklahoma, Case No. PB-2025-35, on July 14, 2025. Mr. Thiessen brings this action in his capacity as Personal Representative of the Estate.

5. **Plaintiff Teresa M. Garcia** is an individual who, at all relevant times, was a resident of Ardmore, Carter County, Oklahoma. Teresa M. Garcia is the sister of decedent Jerry Ray Garcia, and is a sole heir-at-law of the decedent as determined by the District Court of Beckham County, Oklahoma. Teresa M. Garcia brings this action individually for her own injuries and losses.

6. **Plaintiff Christina Garcia** is an individual who, at all relevant times, was a resident of Elk City, Beckham County, Oklahoma. Christina Garcia is the sister of decedent Jerry Ray Garcia, and is a sole heir-at-law of the decedent as determined by the District Court of Beckham County, Oklahoma. Christina Garcia brings this action individually for her own injuries and losses.

7. **Decedent Jerry Ray Garcia** was a twenty-nine-year-old man, born on September 30, 1994, who at all relevant times was a resident of Elk City, Oklahoma. At the time of his death, Mr. Garcia was homeless, stood approximately five feet eleven inches tall, and weighed approximately 135 to 140 pounds. Mr. Garcia was killed by the Defendant Officers on August 2, 2024.

8. **Defendant City of Elk City, Oklahoma** ("the City") is a municipal corporation organized under the laws of the State of Oklahoma, located in Beckham County, Oklahoma. The City is and was at all relevant times the employer and principal of the Elk City Police Department ("ECPD") and all individually named Defendant Officers. The City is a "person" within the meaning of 42 U.S.C. § 1983 and is subject to suit under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

9. **Defendant Josh VanDeburgh** ("Sgt. VanDeburgh") was, at all relevant times, employed by the City of Elk City as a Sergeant with the Elk City Police Department. Sgt. VanDeburgh is sued in his individual and official capacities. At all relevant times, Sgt. VanDeburgh acted under color of state law.

10. **Defendant Logan Nelson** ("Officer Nelson") was, at all relevant times, employed by the City of Elk City as a Patrol Officer with the Elk City Police Department. Officer Nelson is sued in his individual and official capacities. At all relevant times, Officer Nelson acted under color of state law.

11. **Defendant Eddie Holland** ("Chief Holland") was, at all relevant times, the Chief of Police of the Elk City Police Department. Chief Holland was responsible for the supervision, training, discipline, policies, and customs of the ECPD. Upon information and belief, Chief Holland received a complete copy of the ECPD investigation packet regarding the shooting of Mr. Garcia, reviewed the circumstances of Mr. Garcia's death, and failed to impose any discipline, corrective action, or policy changes. Chief Holland is sued in his individual and official capacities.

12. **Defendants John Does 1–10** are officers, supervisors, policymakers, employees, and/or agents of the City of Elk City and/or the Elk City Police Department whose identities are presently unknown to Plaintiffs but who, upon information and belief, participated in, supervised, authorized, ratified, or were otherwise responsible for the unconstitutional conduct described herein. Plaintiffs reserve the right to amend this Complaint to identify these Defendants once their identities are ascertained through discovery.

## JURISDICTION AND VENUE

13. This Court has original federal question jurisdiction over Plaintiffs' claims arising under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 28 U.S.C. § 1331.

14. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

15. Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiffs' claims occurred in Beckham County, Oklahoma.

## FACTUAL BACKGROUND

### A. Mr. Garcia's Vulnerable Condition

16. At the time of his death, Mr. Garcia was homeless and had been living in motel rooms in Elk City. He was unemployed.

17. On July 19, 2024 — approximately two weeks before the shooting — Mr. Garcia had been arrested in Beckham County for the misdemeanor offense of obstructing an officer and was booked into the Beckham County Jail.

18. During his incarceration, on July 31, 2024 — two days before the shooting — Mr. Garcia received a clinical mental health screening through Red Rock Behavioral Health Services' jail-based services program. The screening clinician documented that Mr. Garcia reported symptoms of anxiety and that he had never been diagnosed with or treated for a mental health disorder. His screening revealed a GAD-7 score of 11, indicating moderate anxiety. Mr. Garcia had a history of methamphetamine use beginning at age 14 but reported approximately two years of sobriety.

19. Upon information and belief, Mr. Garcia was released from custody on or shortly before August 2, 2024. He had no place to live, no employment, and no ongoing mental health treatment.

### B. The Dispatch Call Indicates a Mental Health Crisis

20. On August 2, 2024, at approximately 19:11 hours, Elk City Police Department dispatcher Maylee Chaney received a non-emergency telephone call from citizen Darrell Price regarding a disturbance near 2703 E Highway 66, Elk City, Beckham County, Oklahoma. The call was classified as a "Disturbance."

21. Mr. Price reported that a male subject (later identified as Jerry Garcia) was standing in the middle of the service road "acting like he wanted to get hit," wearing a blue shirt and khaki pants, and that a female was also present. Mr. Price reported the male appeared intoxicated.

22. The description of a man standing in the roadway "trying to get someone to hit him" indicated suicidal ideation or a severe mental health crisis. Indeed, the ECPD's own investigating officer, Captain Sammy Weygand, later characterized the report as "referring to possibly suicide." This information was communicated to the responding officers before

their arrival. Defendants VanDeburgh and Nelson knew or should have known, before arriving on scene, that they were responding to an individual exhibiting signs of a mental health crisis, diminished capacity, and possible suicidal intent — not an armed confrontation.

23. Communications Control Officer Mary Chronister dispatched Patrol Officer Logan Nelson (Badge No. 37) to the location. Sergeant Josh VanDeburgh advised dispatch that he would respond as backup.

### C. Officers Arrive and Establish Lethal Cover

24. According to the ECPD radio log, Officer Nelson arrived on scene at 19:16:40 hours — approximately five and a half minutes after the initial dispatch call. He observed Mr. Garcia in a grassy ditch area on the north side of the Highway 66 service road, near the southeast corner of the Super 8 motel parking lot.

25. Officer Nelson exited his patrol vehicle, gave verbal directives to Mr. Garcia, and within seconds drew his duty handgun, establishing lethal cover on Mr. Garcia from a distance of approximately 35 to 40 feet.

26. Sgt. VanDeburgh arrived shortly thereafter, at approximately 19:17:12, and also drew his firearm, establishing a second position of lethal cover. At 19:18:00 — approximately 80 seconds after Officer Nelson's arrival — Sgt. VanDeburgh radioed dispatch the single word: "GUNPOINT."

27. For over a full minute preceding the shooting, both officers had their weapons drawn, their sights directed at Mr. Garcia, and lethal cover firmly established. Neither officer was

required to recognize a threat, unholster a weapon, or acquire a target — all of these steps had been completed well in advance of the shooting.

28. During this extended period of established lethal cover, the officers had available to them — and failed to use — a range of reasonable alternatives to deadly force, including but not limited to: (a) maintaining their covered positions behind their patrol vehicles while continuing verbal negotiations; (b) tactically retreating to increase distance and create additional time; (c) waiting for the arrival of additional officers with less-lethal equipment, who were already en route; (d) issuing clear, coordinated, and unified commands rather than contradictory ones; and (e) requesting crisis-intervention-trained officers or mental health professionals to respond. The officers employed none of these alternatives.

### D. The Contradictory Commands and "Compliance Trap"

29. Rather than employing calm, measured de-escalation techniques suitable for a person exhibiting signs of emotional distress and diminished capacity to reason, the officers subjected Mr. Garcia to a chaotic series of rapid, overlapping, and directly contradictory commands.

30. Officer Nelson repeatedly commanded Mr. Garcia, "Don't touch that knife," while simultaneously ordering him to "Keep your hands up."

31. At approximately the same time Officer Nelson shouted "Keep your hands up," Sgt. VanDeburgh directly contradicted him by shouting **"Hands down!"**

32. Despite these conflicting commands, Mr. Garcia remained stationary in the grass for the vast majority of the encounter, with his hands largely visible and away from his pockets.

33. Then, in a critical reversal, Officer Nelson explicitly countermanded his own prior instructions. Rather than continuing to order Mr. Garcia to leave the weapon alone, Officer Nelson issued a direct, affirmative order to produce it: **"Take that knife out of your pocket."**

34. A few seconds later, Mr. Garcia reached toward his pocket or waist area and produced a knife — in apparent compliance with the direct, affirmative order of a sworn police officer.

35. Immediately after Mr. Garcia produced the knife, the officers began screaming simultaneously for him to "Put the knife down" and "Now!" — directly contradicting the order that had just been given to retrieve it and the order to keep his hands up and the order to keep his hands down.

36. Mr. Garcia did not exhibit a focused, defiant, or combative posture at any time during the encounter. Instead, he appeared bewildered and confused, and was heard repeating a nonsensical phrase indicating profound disorientation, cognitive overload, or a mental health crisis. His demeanor was consistent with an individual who had a diminished capacity to understand or comply with rapid, contradictory commands from multiple officers.

37. Through their reckless and deliberate conduct, the officers created a fatal "compliance trap": Mr. Garcia's apparent compliance with Officer Nelson's explicit command to retrieve the knife triggered the officers' lethal response. The officers' own contradictory, chaotic communication unreasonably created the very crisis to which they then responded with deadly force.

### E. The Shooting of Jerry Ray Garcia

38. At 19:18:39 hours — approximately two minutes after Officer Nelson first arrived on scene — Sgt. VanDeburgh radioed: "SHOTS FIRED / SUSPECT DOWN."

39. In the final seconds of the encounter, while under a barrage of overlapping screaming from both officers, Mr. Garcia broke his stationary posture in the ditch.

40. He walked toward the officers at a steady, normal pace. He was **not running, not charging, and not sprinting**. He did **not lunge** at the officers. He did **not make any slashing, stabbing, or throwing motions** with the knife. His arms were down at his sides, swinging naturally with his stride.

41. Mr. Garcia took approximately three steps, covering roughly 4 to 6 feet, moving from the grass onto the edge of the paved road.

42. Upon information and belief, Mr. Garcia's movement toward the officers was consistent with an attempt to surrender or hand over the knife in compliance with the officers' commands, rather than an aggressive advance. No reasonable officer, having just ordered a suspect to produce a weapon, could objectively interpret a slow, non-aggressive approach with the weapon held at the suspect's side as an imminent deadly attack.

43. At the moment the first shot was fired, Mr. Garcia was approximately **15 to 20 feet away** from the officers. Mr. Garcia stood five feet eleven inches tall and weighed approximately 135 to 140 pounds. He did not pose an immediate threat of serious physical harm to either officer.

44. Both officers simultaneously discharged their duty firearms. They fired a rapid, continuous volley of at least twelve (12) to fourteen (14) shots over a span of approximately four seconds.

45. The barrage of gunfire continued even as Mr. Garcia collapsed to the pavement.

46. A disinterested civilian bystander who witnessed the shooting from a nearby vantage point was heard stating: **"All he saw him do is walk toward them."**

### F. Post-Shooting Conduct

47. After the shooting, officers maintained lethal cover on Mr. Garcia as he lay face down and motionless in the ditch. Officer Jason Harris arrived on scene, drew a Less Lethal shotgun loaded with ALS 1212 bean bag ammunition, and gave multiple commands for Mr. Garcia to show his hands. Mr. Garcia did not move or respond.

48. Sgt. VanDeburgh approached Mr. Garcia and placed him in handcuffs despite his complete lack of movement or response.

49. Mr. Garcia was rolled onto his back to allow Elk City EMS to examine him. EMS determined that no life-saving measures could be performed. **Jerry Ray Garcia was dead.**

50. A knife was found directly beneath Mr. Garcia's body. A knife sheath was observed on his right side.

51. Following the shooting, Sgt. VanDeburgh was observed by fellow officers to be in **"obvious distress."**

52. Officer Harris's arrival with a Less Lethal shotgun and bean bag rounds demonstrates that less-lethal force options were available at the scene and would have been deployed within moments had the officers exercised any restraint before resorting to deadly force.

### G. The Autopsy and Cause of Death

53. An autopsy was performed on Mr. Garcia on August 4, 2024 by Dr. Inas Yacoub, M.D. at the OCME Central Division (Case No. 2404799).

54. Mr. Garcia was struck by at least fourteen (14) bullets, resulting in a minimum of twenty-one (21) distinct gunshot wounds to his head, neck, torso, and extremities.

55. At least seven (7) gunshot entrance wounds were located on Mr. Garcia's **back**, including wounds to the upper back, lower back, right lower back, left lower back, left upper back, and the left back of his head. These bullets traveled forward through his body — indicating that Mr. Garcia was **not facing the officers** when those shots were fired.

56. A bullet entered the left back of Mr. Garcia's head, resulting in skull fractures, brain laceration, and subdural and subarachnoid hemorrhage. The bullet lodged in the right side of his head. Bullets also perforated both lungs, his aorta, diaphragm, liver, stomach, and intestines.

57. No soot or gunpowder particles were found on the skin surrounding any of the gunshot wounds, confirming that all shots were fired from a distance — consistent with the 15-to-20-foot distance observed on the video evidence.

58. Toxicology testing revealed a blood alcohol concentration of only 0.02 g/dL — well below the legal limit — and vitreous humor tested negative for alcohol.

59. The Medical Examiner determined the **cause of death** to be **Multiple Gunshot Wounds** and classified the **manner of death** as **Homicide**.

## H. The ECPD Use of Force Review

60. On December 31, 2024, nearly five months after the shooting, the ECPD convened a Use of Force Review Board to evaluate the officers' use of deadly force. The Board was composed of Major John Cook (Assistant Chief of Police), Captain Scott Goodman (Patrol Captain), and Lieutenant Brad George (Patrol Lieutenant).

61. Neither Sgt. VanDeburgh nor Officer Nelson appeared before the Review Board for questioning. The Board instead relied upon the OSBI investigative report and body camera footage, reviewed "both collectively and independently."

62. The Review Board unanimously found the shooting "reasonable, necessary and within the guidelines of this department's policy," notwithstanding the facts that (a) the officers had created a compliance trap through contradictory commands; (b) Mr. Garcia was not charging, lunging, or making aggressive movements; (c) the officers had at least 80 seconds of established lethal cover before the shooting; and (d) at least seven gunshot entrance wounds were on Mr. Garcia's back.

63. Notably, the Review Board's own synopsis claimed that Mr. Garcia "advanced toward the officers to within approximately ten to twelve (10–12) feet" — a characterization directly contradicted by the video evidence, which shows the distance was approximately 15 to 20 feet at the time of the first shot. The Review Board conducted no independent distance measurements or scene reconstruction.

## COUNT I

## VIOLATION OF 42 U.S.C. § 1983 — EXCESSIVE FORCE UNDER THE

## FOURTH AMENDMENT

### (Against Defendants VanDeburgh and Nelson in Their Individual Capacities)

64. Plaintiffs incorporate by reference paragraphs 1 through 63 as though fully set forth herein.

65. At all times relevant hereto, Defendants VanDeburgh and Nelson acted under color of state law as officers of the Elk City Police Department.

66. The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, guarantees every person the right to be free from unreasonable seizure, which includes the right to be free from the use of excessive and unjustified deadly force by law enforcement officers. *Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985).

67. The force used by Defendants VanDeburgh and Nelson was objectively unreasonable under the totality of the circumstances and violated Mr. Garcia's clearly established Fourth Amendment rights. Specifically:

a. Mr. Garcia did not pose an immediate threat of serious physical harm to the officers or to anyone else at the time deadly force was used. He was walking at a normal pace, approximately 15 to 20 feet away, with the knife held at his side. He was not charging, not lunging, and not making any slashing, stabbing, or throwing motions;

b. The officers knew or should have known, from the dispatch information available to them before arrival and from their direct observations on scene, that Mr. Garcia was an individual exhibiting signs of a mental health crisis, emotional distress, and diminished capacity to understand or comply with commands — not an individual engaged in criminal aggression;

c. Because the officers had established lethal cover with drawn weapons aimed at Mr. Garcia for over a minute prior to the shooting, they had ample time and distance from Mr. Garcia that he was not an immediate threat;

d. The officers' own reckless and deliberate conduct in the moments immediately preceding the shooting unreasonably created the need to use deadly force. The officers' chaotic, simultaneous, and directly contradictory commands to a bewildered, confused individual in crisis recklessly escalated a welfare call into a deadly encounter;

e. The officers' reckless and deliberate conduct was immediately connected to any perceived threat: Officer Nelson explicitly ordered Mr. Garcia to "take that knife out of your pocket," and when Mr. Garcia complied with that direct command, the officers treated his compliance as justification for lethal force;

f. The sheer volume of force used — at least 14 rounds fired over four seconds — was grossly disproportionate to any threat that may have existed from a non-aggressive man walking at 15 to 20 feet;

g. At least seven (7) gunshot entrance wounds were located on Mr. Garcia's back, demonstrating that the officers continued to fire even when Mr. Garcia was no longer facing them and was not posing any threat;

h. A less-lethal shotgun loaded with bean bag ammunition was available at the scene and would have been deployed within moments had the officers exercised any restraint before resorting to deadly force;

i. The entire encounter, from Officer Nelson's arrival on scene to the fatal gunfire, lasted approximately two minutes — an unreasonably compressed timeframe in which the officers failed to avail themselves of any of the alternatives to deadly force available to them.

68. The reasonableness of the officers' use of force must be evaluated not only at the precise moment of the shooting, but in light of the totality of the officers' conduct during the encounter, including whether their own reckless or deliberate conduct immediately preceding the shooting unreasonably created the need to use such force. The officers' pre-shooting conduct — including chaotic commands to an emotionally distraught individual with a diminished capacity to reason, the explicit order to produce a weapon, and the failure to use any of the available alternatives to deadly force — was immediately connected to any threat that may have existed at the moment of the shooting.

69. Every reasonable officer would have understood that shooting a non-charging individual who is holding a knife at his side, who is not making any aggressive movements, who is

exhibiting signs of confusion and emotional distress, and who has just been ordered by the officer himself to produce the weapon, violates the Fourth Amendment.

70. The actions of Defendants VanDeburgh and Nelson were deliberately indifferent to Mr. Garcia's clearly established constitutional rights and showed reckless and callous disregard for his life.

71. As a direct and proximate cause of Defendants' unconstitutional conduct, Mr. Garcia was killed, and Plaintiffs suffered the injuries, damages, and losses described herein.

## COUNT II

## VIOLATION OF 42 U.S.C. § 1983 — MUNICIPAL LIABILITY UNDER

## MONELL

### (Against Defendant City of Elk City)

72. Plaintiffs incorporate by reference paragraphs 1 through 71 as though fully set forth herein.

73. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, a municipality is liable under § 1983 when a constitutional injury is caused by the enforcement of a municipal policy, custom, or practice, or by a failure to train that amounts to deliberate indifference to constitutional rights. *City of Canton v. Harris*, 489 U.S. 378 (1989).

74. Upon information and belief, the City of Elk City maintained and enforced official policies, customs, and/or persistent patterns that caused or contributed to the unconstitutional killing of Mr. Garcia, including but not limited to:

a. A failure to train ECPD officers on crisis intervention techniques and how to effectively, safely, and calmly communicate with individuals exhibiting signs of emotional distress, mental health crises, suicidal ideation, or diminished capacity to reason;

b. A failure to train officers on the critical necessity of issuing clear, unified, and non-contradictory commands to suspects, particularly those exhibiting signs of impairment, confusion, or emotional distress;

c. A failure to train officers on the proper use and tactical limitations of force-response principles when officers have already drawn their weapons and established lethal cover, resulting in premature use of deadly force against individuals armed with edged weapons who are not charging, not lunging, and not making aggressive movements;

d. A failure to train officers on the availability and deployment of less-lethal force alternatives prior to the use of deadly force, and on the obligation to exhaust reasonable alternatives before resorting to lethal force against non-aggressive individuals;

e. A custom or pattern of permitting officers to create deadly exigencies through their own reckless and deliberate pre-seizure conduct, and then shielding them from accountability;

f. A custom or practice of ratifying unconstitutional uses of deadly force through internal investigations that reach predetermined conclusions favorable to the officers

— as demonstrated by the ECPD's Use of Force Review Board, which on December 31, 2024 unanimously found the shooting "reasonable" without independently questioning either officer, without conducting any independent scene reconstruction, and despite video evidence directly contradicting key factual findings in its synopsis;

g. A pattern or custom of tolerating excessive and unnecessary force by its officers, as evidenced by ECPD's disciplinary records, which reflect that ECPD officer Jesse Meyer — a responding officer who arrived on the scene of Mr. Garcia's shooting — was disciplined for violating the department's Use of Force Policy (Policy No. 300.3.2) in November 2022, resulting in a two-week suspension and extended probation, and was again disciplined in August 2024 for using unnecessary physical force on a nine-year-old child, circumstances which demonstrate a systemic failure to correct use-of-force deficiencies within the department.

75. The need for the training and policies described above was so obvious, and the inadequacy of the City's existing training so likely to result in the violation of constitutional rights, that the City's failure constituted deliberate indifference to the rights of persons who, like Mr. Garcia, would come into contact with ECPD officers during mental health crises.

## COUNT III

## VIOLATION OF 42 U.S.C. § 1983 — SUPERVISORY LIABILITY

### (Against Defendant Holland in His Individual Capacity)

76. Plaintiffs incorporate by reference paragraphs 1 through 75 as though fully set forth herein.

77. Chief Holland had supervisory authority over Defendants VanDeburgh and Nelson, and was the final policymaker responsible for ensuring that ECPD officers were adequately trained in the constitutional use of force, crisis communication, de-escalation, and interaction with emotionally distraught individuals.

78. Upon information and belief, following the shooting of Mr. Garcia, Captain Sammy Weygand prepared a complete investigation packet including officer narratives, body camera footage, bystander video, dispatch recordings, and scene photographs. Copies of the packet were provided to Chief Holland.

79. Upon information and belief, after receiving and reviewing the investigation packet, Chief Holland:

    a. Failed to impose any discipline or corrective action against Defendants VanDeburgh or Nelson for the unconstitutional use of deadly force;

    b. Failed to implement or revise any policies, procedures, or training to prevent the recurrence of the reckless communication and escalation tactics that led to Mr. Garcia's death;

    c. Authorized the Use of Force Review Board's finding that the shooting was "reasonable, necessary and within the guidelines of this department's policy," notwithstanding the video evidence contradicting the Board's factual findings;

    d. Thereby ratified the unconstitutional conduct of Defendants VanDeburgh and Nelson.

80. Upon information and belief, Chief Holland knew or should have known of deficiencies in ECPD officers' training regarding use of force on individuals in mental health crises, the dangers of issuing contradictory commands to emotionally distraught individuals, and the obligation to exhaust alternatives before resorting to deadly force. Chief Holland was further on notice of a pattern of use-of-force violations within the ECPD, including the repeated disciplinary actions taken against Officer Jesse Meyer in 2022 and 2024 for excessive and unnecessary use of force, and failed to take corrective action to address the department's systemic deficiencies.

81. Chief Holland's deliberate indifference to, and tacit authorization and ratification of, the unconstitutional conduct alleged herein was a direct and proximate cause of Mr. Garcia's death.

## COUNT IV

## WRONGFUL DEATH AND SURVIVAL ACTION UNDER OKLAHOMA LAW

### (Against All Defendants)

82. Plaintiffs incorporate by reference paragraphs 1 through 81 as though fully set forth herein.

83. This Count is brought pursuant to the Oklahoma Wrongful Death Statute, Okla. Stat. tit. 12, § 1053, and the Oklahoma Survival Statute. This is the only cause of action brought by the individual, non-estate, plaintiffs.

84. At all times relevant hereto, Defendants owed a duty of care to Mr. Garcia, including the duty to refrain from using unreasonable, excessive, or deadly force.

85. Defendants breached their duties of care to Mr. Garcia by, among other things:

a. Using unreasonable and excessive deadly force against Mr. Garcia when the use of such force was not justified;

b. Failing to utilize de-escalation techniques, crisis intervention strategies, or less-lethal force alternatives that were available at the scene;

c. Issuing chaotic, overlapping, and directly contradictory commands to a bewildered and confused individual that foreseeably escalated a mental health crisis into a fatal encounter;

d. Explicitly ordering Mr. Garcia to produce a knife and then treating his compliance as a threat warranting lethal force;

e. Failing to properly train, supervise, and discipline officers regarding use of force, crisis communication, and interactions with emotionally distraught individuals.

86. As a direct and proximate result of Defendants' negligent, reckless, and wrongful conduct, Mr. Garcia suffered conscious physical pain and suffering prior to death, mental anguish, fear of impending death, and fatal injuries.

87. As a direct and proximate result of Defendants' conduct, the surviving family members of Mr. Garcia, including Plaintiffs Teresa M. Garcia and Christina Garcia, have suffered and will continue to suffer:

a. Loss of companionship, love, affection, care, comfort, guidance, counsel, and society of Mr. Garcia;

b. Mental anguish, grief, and emotional distress;

c. Loss of financial support;

d. Funeral and burial expenses;

e. Other compensable damages as proven at trial.

### PUNITIVE DAMAGES

88. The conduct of Defendants VanDeburgh, Nelson, and Holland, as alleged herein, was willful, wanton, malicious, and/or exhibited a reckless and callous disregard for the federally protected rights of Mr. Garcia. Defendants' conduct warrants an award of punitive damages against them in their individual capacities in an amount sufficient to punish and deter, pursuant to 42 U.S.C. § 1983 and Okla. Stat. tit. 23, § 9.1.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants, and award the following:

A. Compensatory damages in an amount to be proven at trial, including but not limited to damages for loss of life, conscious pain and suffering, mental anguish, fear of impending death, loss of companionship and society, grief, loss of financial support, and funeral and burial expenses;

B. Punitive damages against Defendants VanDeburgh, Nelson, and Holland in their individual capacities in an amount sufficient to punish and deter;

C. Reasonable attorneys' fees, litigation expenses, and costs of suit pursuant to 42 U.S.C. § 1988;

D. Pre-judgment and post-judgment interest as allowed by law;

E. Declaratory and injunctive relief as the Court deems just and proper;

F. Such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## RESERVATION OF ADDITIONAL CLAIMS

Plaintiffs expressly reserve the right to amend this Complaint to add additional claims, parties, and/or allegations as further facts are ascertained through discovery, investigation, or other means.

Respectfully submitted,

LAIRD, HAMMONS, LAIRD, PLLC

*s/Jason Hicks*
Chris Hammons, OBA # 20233
Jason M. Hicks, OBA# 22176
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:     (405) 703-4567
Facsimile:     (405) 703-4061
E-mail: chris@lhllaw.com
         jason@lhllaw.com
ATTORNEYS FOR PLAINTIFF

**ATTORNEY LIEN CLAIMED**